## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **VÍCTOR LUIS RODRÍGUEZ-PIZARRO**<br><br>**Plaintiff**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA**<br><br>**Defendant** | **CIV. NO. 23-** |

## COMPLAINT FOR DAMAGES
## UNDER THE FEDERAL TORT CLAIMS ACT

**TO THE HONORABLE COURT:**

NOW COMES THE PLAINTIFF, Víctor Luis Rodríguez-Pizarro, by undersigned counsel, and respectfully present his claim for damages against the United States of America, and in support thereof, states as follows:

### INTRODUCTION

1.1 This is an action against the United States of America under the Federal Torts Claims Act, *28 USC sec. 2671 et seq,* and *28 USC sec. 1346(b)(1)* for negligence and professional malpractice in connection with medical care provided to the plaintiff by the Department of Veteran Affairs in San Juan, Puerto Rico (*aka VA Sunshine Health Care.*)

1.2 The claims herein are brought against the United States pursuant to the above statutes, for money damages as compensation for personal injuries caused by the defendant's negligence

1.3   Plaintiff Víctor Luis Rodríguez-Pizarro has fully complied with the provisions of *28 U.S.C. sec. 2675* of the Federal Tort Claims Act.

1.4 This action is timely filed, given that Plaintiff Rodríguez notified his claim to the appropriate federal agency on or after June 21, 2022, less than two years after the incidents forming the basis of this suit, and of yet, there has been no final disposition of the aforementioned claim.

## II. <u>PARTIES, JURISDICTION AND VENUE</u>

2.1 Plaintiff Victor Luis Rodríguez  ("the plaintiff" or "Mr. Rodríguez"), date of birth, 1953, is a legally blind Vietnam-era Veteran who  receives medical services at the Veteran's Administration, through VA Sunshine Caribbean Healthcare System in San Juan, Puerto Rico (aka VA Caribbean).

2.2 Defendant United States of America ("the defendant")  provides medical and related care to a covered population, including plaintiff Rodríguez, through its agency, the Department of Veterans Affairs, as well as its directors, officers, operators, administrators, agents and staff at the Veteran's Administration's facilities in San Juan, Puerto Rico, at times referred to as the San Juan VA Medical Center or VA Sunshine Caribbean Healthcare System and in this complaint, referred to as "the San Juan VA Hospital" or "the VA".)

2.3 At all times relevant to this Complaint, the San Juan VA Hospital held itself out to the plaintiff and other eligible beneficiaries as a provider of quality health care consistent with the norms governing the provision of such care and with

the expertise necessary to maintain the health and safety of patients such as the plaintiff.

2.4 At all times pertinent hereto, the directors, officers, operators, clinicians, administrators, employees, staff and all other kinds of agents to which reference is made herein were employed by and/or acting on behalf of the defendant.

2.5 The defendant is responsible for the negligent acts of said directors, officers, operators, clinicians, administrators, employees, staff and all other kinds of agents under the doctrine of vicarious responsibility.

2.6 Jurisdiction is proper under 28 USC sec. 1346(b)(1), since this case is against the United States, for money damages for personal injury caused by the negligent or wrongful act or omission *de facto* or *de jure* employees of the Government, while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of Puerto Rico, where the acts and/or omissions omission occurred.

### III. <u>FACTS</u>

## A. <u>Overall Summary</u>

3.1 On June 21, 2021, a laser prostatectomy was performed on plaintiff Rodríguez, a 68-year old blind veteran, at the VA Hospital in San Juan, submitting him to a transurethral resection of the prostate (TURP), to treat urinary problems associated with the enlarged prostate (prostatic hyperplasia.)

3.2 Prior to the surgery, Mr. Rodríguez was informed that it was a relatively uncomplicated ambulatory procedure.  Nothing was said about the possibility of surgically-related items remaining within his penis after the operation.

3.3 After he was operated on and spent time in recovery following a spinal anesthetic, Mr. Rodríguez was instructed by a VA nurse to stand up and attempt to walk.  As Mr. Rodríguez followed these instructions, the Foley catheter which had been inserted in connection with the procedure fell out, filled with urine.

3.4  The person who gave the instruction to Mr. Rodríguez simply picked up the Foley, threw it out, and then told Mr. Rodríguez that he was free to leave the facility, which he did.

3.5 This incident was not initially recorded in the hospital records related to the surgery.

3.6 Eventually, it turned out that part of the Foley, a plastic item, remained in plaintiff's penis, causing him extreme pain and distress.

3.7 Following the procedure, Mr. Rodríguez's life was completely altered, characterized by intense pain and discomfort, having no control over his bladder. He suffered constant extreme pain, discomfort, anxiety, frustration, depressive symptoms, bodily manifestations of stress, sleeplessness, pressure, severe problems in urination, humiliation, discomfort, social limitations and similar injuries, as well as loss of enjoyment of life, and expenses related to medical care.

3.8  For the next several months, Mr. Rodríguez was in very frequent contact

4

with the VA, both with his urology follow-ups and in the context of receiving assistive services connected with adjusting to his blindness.

3.9 At every chance he got, Mr. Rodríguez informed the VA of the severe post-operative developments, seeking further medical assistance, informing the VA that his condition was still severe and not improving, and was definitely related to the surgery. He was dismissed by VA health care professionals, who informed him that his conditions had to do with his age, and had nothing to do with the surgery.

3.10 No heed was given to the information he was providing to the VA health care professionals assigned to his case, and no corrective action was taken for several months.

3.11 Although it should have been plain that Mr. Rodríguez's problems stemmed from the operation, the medical professionals assigned to his case failed to investigate properly and failed to address his concerns adequately, all the while insisting that it had nothing to do with the surgery, and blaming Mr. Rodríguez's reported injuries and pain on his age. The staff even went so far as to "orient" Mr. Rodríguez about the error of his impression that his severe symptoms resulted from the surgery.

3.12 Out of desperation, Mr. Rodríguez finally sought out another opinion from a physician he saw privately and paid for. He was told that he needed a cytoscopy under general anesthesia, to ascertain if there was some blockage. His private physician informed him that this was the appropriate course of medical

treatment, consistent with the standard of care in Puerto Rico.

3.13 After multiple visits and other contacts with the VA personnel, during which the VA consistently dismissed Mr. Rodríguez's complaints, a cytoscopy was finally performed in mid-January, 2022, under general anesthesia, and it was determined that the specimen causing the terrible symptoms experienced by Mr. Rodríguez was, in fact, the Foley improperly remaining in his body the previous June of 2021.

3.14 Víctor Luis Rodríguez-Pizarro comes before this Court seeking damages for the negligence committed by the VA with respect to this complex of events, which lasted for close to seven months, in not informing him of the risks involved, in misdiagnosing the problem, in leaving the Foley in place, in ignoring his pleas for help, in discounting his description of his symptoms, in attempting to belittle him, in disregarding the second opinion he sought, in subjecting him to intolerable pain (and then not taking his reports thereof seriously), in subjecting him to a separate surgery, this time under general anesthesia, and in prescribing unnecessary tests and potentially dangerous medications to him, all in violation of the standard of care prevailing in this jurisdiction.

## B. Detailed factual allegations

4.1 On June 14, 2021, Mr. Rodríguez, who was suffering symptoms related to an enlarged prostate and obstructive uroflow, was evaluated by the operating surgeon, Dr. Elizabeth Perazza-Valentín, in preparation for the TURP surgery to be

performed shortly thereafter.  The plan of treatment was to be cystoscopy and prostate laser VS TRANS URETHRAL RESECTION."

4.2 Prior to the operation, planned for June 21, 2021, Mr. Rodríguez was never informed that a potential risk of the surgery was to have a foreign object lodged in his penis.

4.3 The operation took less than 25 minutes.

4.4 The Operative Report of the June 21st surgery indicates that the procedure was "photoselective vaporization of prostate with laser (Greenlight laser XPS)" to correct "hypertrophy (benign) of Prostate with Urinary Obstruction."

4.5 The post-operative diagnosis was Obstructive Prostate.  There were no lesions, no stricture and ample caliber of the Urethra.  The Prostrate "obstructs with prominent median lobe and bilateral kissing lobes of 4cm of length.  The Vesical neck (urinary bladder) was "open". The bladder is said to have "adequate capacity, MINIMAL trabeculations, no diverticuli, no calculi, no papillary tumors, no erythematous lesions, no ulcers."

4.6 The Operative Report also notes that there were no post-procedure or in-procedure complications.  No foreign body identified at the completion of the surgery.  The indwelling foley passed, "irrigated with saline solution obtaining clear yellow backflow.  No pain reported by patient."

4.7 During the operation, spinal anesthesia was administered.  The effects of the anaesthesia lasted for approximately two hours, and Mr. Rodríguez was

discharged several hours later, after spending time in recovery.

4.8 Before he was discharged, Mr. Rodríguez was instructed by a person he understood to be a nurse to stand up and attempt to walk.

4.9 As he did so, the Foley catheter which had been inserted fell out.

4.10 Once this happened, the person Mr. Rodríguez understood to be a nurse threw the Foley into the garbage and instructed Mr. Rodríguez that he was free to leave and go home.

4.11 The applicable hospital notes concerning the procedure state that by the end of the day, Mr. Rodríguez was able to walk and had reached an acceptable level for the procedure to be considered completed.

4.12 He was giving a score of 10 on the discharge scoring system.  Nothing was said of the Foley.

4.13 Mr. Rodríguez was discharged after receiving clearance by Anesthesiologist.

4.14  The Nurse's note on the surgery and the note by the urology technician/nurse both prepared on June 22, 2021, the day following the surgery, give different versions as to when the Foley was removed, with the first stating that it was removed in the urology clinic the day after the surgery, and the latter stating that the "patient removed Foley at home."

4.15 Mr. Rodríguez strenuously denies that he left the hospital with the Foley in place, but has consistently affirmed that the Foley fell out as described above, and

was discarded by the employee immediately thereafter.

4.16  After the procedure, Mr. Rodríguez experienced intense pain and extraordinary discomfort, having no control over his bladder.

4.17  Upon seeking further medical assistance, Mr. Rodríguez was instructed to provide a urine sample.

4.18 This, he could not do, since after the surgery, he had no control over his urination.  Thereafter, following significant ingestion of water, his bladder emptied in his automobile, damaging the car and causing him significant embarrassment in front of his wife, Giovanny Santana.

4.19 Four days after surgery, on June 25, 2021, Mr. Rodríguez contacted the VA pharmacy Service, for matters relating to his medications.  By that time, he was convinced that serious problems he was already experiencing related to the operation. The pharmacy technician observed that Mr. Rodríguez had been "trying to get in contact with someone at the Urology Clinic.  He was complaining of some discomfort when urinating and he just got surgery on Monday."

4.20 On June 30, 2021, nine days after the surgery, a follow-up meeting was held between Mr. Rodríguez and the operating surgeon, Dr. Perazza.  Advice was given to Mr. Rodríguez concerning post-operative conduct.  He was told *inter alia* to maintain a diet free of irritants and to avoid strenuous activities and do Kegel exercise.

4.21 According to the record, no uroflow was available.  This was consistent

with what Mr. Rodríguez was telling the VA, to no avail.

4.22   On July 7, 2021, Mr. Rodríguez was experiencing such pain and discomfort that he went to the VA Emergency Room.   He was told to follow-up with his scheduled appointments.   He was discharged from the ER without further analysis.

4.23 On July 29, 2021, Mr. Rodriguez had a 22-minute phone consult with a Nurse Practitioner.   Although by this time, the urinary incontinence which could be associated with the surgery some five weeks earlier, should have resolved, Mr. Rodríguez informed the Nurse Practitioner of the extreme symptoms he was feeling.

4.24 A follow-up urology appointment was scheduled for August 24th, 2021

4.25 Mr. Rodríguez went to the August 24th appointment, at which point, despite his pleas for help, his complaint was listed merely as "urinary incontinence," and he was given a provisional diagnosis of "overactive bladder." The operating surgeon, Dr. Perazza-Valentín, indicated in the record that Mr. Rodríguez reported "worsening of urinary incontinence despite doing Kegel exercises and using trospium." The doctor indicated that mirabegron would be added (to other medications plaintiff had been taking), and the response would be assessed prior to Botox therapy.

4.26 In the notes concerning the August 24th consult, no mention is made of the June 21st operation.   However, on that same day, August 24, 2021, Dr. Perazza-Valentín appears to have prepared her pre-operative notes relating to the June 21st

surgery.  On that date, she prepared a, "Preoperative Attending Staff Note," and the "standard title," "surgery preoperative E & M Note." Another note prepared that day, is entitled "consent" for the June 21st surgery.

4.27 On August 26th, 2021, Mr. Rodríguez had a virtual video call with a Blind Rehabilitation Specialist, primarily to assist Mr. Rodríguez in the use of telephonic devices.  The Rehabilitation Specialist noted that "[a]t the beginning of the session veteran expressed frustration because of [the] prostate problems he is having.  He indicated that this is making him very uncomfortable.  He indicated that he talked to his doctor and decided to look for a second opinion outside the VA."

4.28 On the following day, August 27, 2021, there was a pharmacy medication consult regarding the prescription authorization for Onabotulinumtoxina (osybutynin and trospium – antimuscarinic agents) and Botulinum Toxin (Botox), to attend to Mr. Rodríguez's "bladder muscle dysfunction (overactive)" In the pharmacy note, iT is stated that Mirabegron was being requested for "overactive bladder," since oxybutynin and trospium were not getting the desired result.  The request was approved.

4.29 The next appointment was scheduled for **September 22, 2021**. On that date, Mr. Rodríguez had a 15-minute phone call with Dr. Elizabeth Perazza.  The records reflect his chief complaint as "overactive bladder."

4.30 According to the hospital records, Dr. Perazza informed Mr. Rodríguez of the risks vs benefits of medicine therapy vs. consideration of surgical intervention,

11

She indicated that after the uroflow (a diagnostic test to determine rate of urine flow over time), the matter would be examined, to assess therapy through medication, diet and exercises and to consider "a possible change of therapy."

4.31. Over the next several months, Mr. Rodríguez frequently informed the VA of the extreme difficulties he was experiencing, which were totally interfering with his quality of life:

a. On October 28, 2021, Mr. Rodríguez met with a Health Technician and informed him that he had no control over his urine, and that he was using a great number of diapers;

b. On November 30, 2021, the VA scheduled a bladder scan, with further procedures to take place on December 9th. Telephonic follow-up was scheduled for December 22, 2021.

c. There was another consult on December 20, 2021, this time with the VA Urology Section Chief.  The notes reflect that Mr. Rodríguez was "complaining of urge incontinence, needing to use diapper (sic) and dysuria."  After a lengthy consult, the Head of the Urology Section told Mr. Rodríguez that the urge incontinency was likely *related to age* and bladder irritation *secondary to obstruction, rather than surgery*.

d. According to the records, the "Patient [was] oriented that *urge incontinence is not secondary to incorrect surgery procedure."*  He was also told that the condition could be treated with medication, including

mirabegron.

4.32 At that time, a full *six months* after the surgery, the VA Urology Chief noted that Mr. Rodríguez was to be evaluated for "possible cystoscopy versus a cystometrogram."

4.33 Unsatisfied with the ongoing problems and the state of his health following the June, 2021 surgery, and after getting no relief or understanding from the VA physicians, Mr. Rodríguez went to a private physician, at the cost of several hundreds of dollars. The outside urologist attempted to pass the cystoscope through the urethra, but he was unable to do so, due to an "obstruction as well as [the fact that] the patient could not tolerate the pain of the procedure."

4.34 The private urologist told Mr. Rodríguez that what was indicated was a Cystoscopy under General Anesthesia.

4.35 In order for this procedure to be done, Mr. Rodríguez would need the approval of the VA medical staff. Described in the VA records as "desperate for treatment," Mr. Rodríguez discussed the matter with the Head of Urology.

4.36 The new year brought on an intolerable severity of the symptoms, causing Mr. Rodríguez to visit the ER with extraordinary frequency.

a. He presented to the Emergency Room on January 1, 2022, in extreme pain. Although he was prescribed antibiotics for a suspected Urinary Tract Infection, this did little to relieve his symptoms, which included incontinence, as Mr. Rodríguez reported that he had to go to

the bathroom more than ten (10) times per night, and also experienced urge incontinence and urgency, as well as shortness of breath, chest pain and malaise.

b. Frustrated by the lack of a solution for his issues and the constant orientation to the effect that his symptoms had nothing to do with the June, 2021 operation, Mr. Rodríguez left the VA with a prescription for medications, against medical advice.

c. On the following day, January 3, 2022, Mr. Rodríguez was contacted by phone by a Primary Care nurse practitioner, pursuant to a request he made to speak to a supervisor, because his Primary Care physician was on vacation. Mr. Rodríguez again informed the VA that he had been his extreme problems related back to his surgery more than six months earlier. Follow up was supposed to be done once his physician returned from Annual Leave.

d. Mr. Rodríguez presented again to the Emergency Room on the next day, January 4, 2022. At that time, a nurse practitioner requested a urology consult, with the provisional diagnosis of "unspecified urethral stricture..." and "urinary tract infection, site not specified." The clinical evaluation "suggested prostate stricture" Again, it was decided to handle the issue on an outpatient basis.

e. At that time, the record indicates that he was diagnosed *inter*

14

*alia* with renal failure, which had resolved.   A physician at the Emergency Room indicated that plaintiff's "chief complaint" was "urine infection" which "has increased frequency and pain, with no improvement with antibiotics."

f. On January 6, 2022, Mr. Rodríguez again presented to the ER, in extreme distress.  According to the records, Mr. Rodríguez presented with "dysuria and painful defecation."  Despite the antibiotics, he now presented with leukocytosis. His medications were changed.

g. A digital rectal exam (DRE) was performed, finding tenderness and an enlarged prostate.

h. A 28-day course of antibiotics was prescribed.  There was also an attempt to have Mr. Rodríguez obtain an earlier urology appointment.

i. The diagnostic impression is listed as "acute bacterial prostatitis w/ Enterococcus Faecalis."

j.  It was also noted that by then, Mr. Rodríguez had gone to a non-VA urologist and that he was "pending special authorization for cystoscopy with anesthesiology due to refractory urinary symptoms since the previous year."  There was a suspicion of "mild leukocystosis and neutrophilis," and further consults were ordered, as well as labs and a CT of the kidney.

k. Mr. Rodríguez was oriented as to what a Urinary Tract Infections

was and was told to "continue with his routine appointments." He was also oriented about the "plan," which was to take Augmentin and to follow-up with urology services on an outpatient basis.

l. Mr. Rodríguez then saw his VA primary care physician the afternoon of January 10, 2022. He complained of "urinary hesitancy, urgency" and waking up some 6 to 8 times per night. He was on an oral antibiotic. Although there was a little improvement of the nocturia, but the symptoms persisted, and he has urinary incontinence. He asked that his urology appointment, scheduled for three months hence, be rescheduled sooner.

4.37 On January 12, 2022, after months of enduring excruciating pain and discomfort, as well as urinary pressure, night urination, blood in his urine, and lack of control, Mr. Rodríguez explained that his symptoms were worsening.

4.38 At that time, the original plan was for Mr. Rodríguez to return home and to try to advance his regular urology appointment. However, other physicians stepped in and took note of both the outside consult which Mr. Rodríguez had done and the fact that he had had dysuria and incontinence since the date of surgery, it was noted that the symptoms (hematuria, dysuria, incontinence) had been "persistent" since surgery.

4.39 After a CT scan of the abdomen and pelvis was finally performed, comparison was made with one done on April 28, 2021 (some 7 weeks before

16

surgery).  The report indicates *inter alia* that "bladder is under distended with Foley catheter in place."

4.40   The decision was made to have Mr. Rodríguez re-admitted to the Hospital, this time to have a cystoscopy the following day, with the removal of a foreign body in the urethra, which had been left there during the surgery seven months earlier.

4.41 Mr. Rodríguez was operated on the following day**,** January 13, 2022.  The primary diagnosis was a "foreign body in urethra"*,* with the "operative procedure" described as a "cystoscopy with removal of foreign object – revision of bladder neck." This was due to the parts of the Foley connected with the surgery performed on June 21, 2021 (Laser Prostatectomy (TURP)."

4.42 The preoperative diagnosis was "Urinary obstruction," and the post-operative diagnosis as "**Foreign Body of [sic] Urethra**."  This is after ""months of dysuria, recurrent UTI and Incontinence."  The January 14[th] discharge note refers to  as "foreign object in urethra."

4.43 Medical records from the surgery reflect that the "cytoscopy revealed we encountered the distal end of a foley catheter with a deflated balloon."  This was removed without difficulty and the remaining procedure was unremarkable.

4.44 A specimen removed from Mr. Rodríguez's penis was identified as a "Foley Catheter."

4.45 Mr. Rodríguez was ordered to be on bed rest and was unable to ambulate

He still had a urinary catheter in place.

4.46 Mr. Rodríguez's case was presented on January 14th, at the Moderation Management (MM) meeting.  The Urology Section Chief as well as the Urology nursing manager were present "No concerns [were] presented."

4.47 As a result of the events described herein, Mr. Rodríguez suffered excruciating pain for a total of approximately 200 days.  He has suffered from an extreme lack of control over his urination, and frightening blood in his urine, as well as a virtually complete limitation of any possibility for social activities, mental anguish and anxiety, infections, sleeplessness, depressive thoughts, humiliation, frustration, hopelessness, desperation, and fear of additional pain and even death.

4.48 He has been the subject of potential ridicule and was not believed by the medical staff charged with his care, who misdiagnosed the issue.

4.49 Mr. Rodríguez was also submitted to unnecessary medical procedures and was prescribed medication which did not resolve his situation, but which had potential side effects which were the subject of considerable worry.

4.50 He also has had to incur in additional expenses, including but not limited as those associated with his obtaining a second opinion, diaper supplies, and those resulting from trips to the VA hospital.

## IV. CAUSE OF ACTION

5.1 All previous paragraphs are re-alleged as if fully set forth herein.

5.2 The VA had a duty to provide adequate medical care and to exercise the

standard of care and the degree of care and skill required of health care providers, consistent with the expertise which the VA presents to the community at large.

5.3 The VA also had the duty to hire competent operators, employees, staff, clinicians and others necessary in order to assure the provision of care consistent with the duty of care and the degree of care and skill required of competent health care providers, as well as retaining and training competent health care professionals to assure adequate care to those serviced by the VA, including Mr. Rodríguez.

5.4 As a result of the failure of the employees, operators, clinicians, staff and others, within the scope of their employment, to comply with the duty of care, Mr. Rodríguez has suffered the damages claimed herein.

5.5 The actions and omissions set forth in detail herein, all done with the scope of employment of those charged with Mr. Rodríguez's care, proximately caused the damages specified herein.

5.6 These actions were negligent and in violation of the duty of care for these services.

5.7 The United States is strictly liable for the damage caused by these individual health care providers, employees, clinicians, staff and agents, who have been entrusted to provide these services.

5.8 The actions and omissions detailed herein, including but not limited to the failure to obtain informed consent, the failure to remove the catheter, the failure to diagnose the ongoing symptoms, the failure to give adequate consideration to the

symptoms which were being reported, including the pain, urinary effects and sleep interference which Mr. Rodríguez brought to the VA's attention, the prescribing of tests, procedures, laboratories and medications which were unnecessary, the humiliation of Mr. Rodríguez, the dismissal of his concerns, the subsequently prepared records, and all related matters, demonstrate the responsibility of the United States for the damages suffered by the plaintiff, as described herein.

5.9 The plaintiff has complied with all pre-requisites to the bringing of this action, in that he presented a claim to the Veterans Department on or about June 22, 2022, and the agency has yet to issue a final decision with respect thereto.

## V. <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** plaintiff Víctor Luis Rodríguez-Pizarro, does hereby pray that judgment be entered in his favor and against the United States of America, in the amount of $1,250,000.00.

And that this Court award costs and attorneys fees in this action, together with such further relief at law or in equity which this Court may deem appropriate.

RESPECTFULLY SUBMITTED in San Juan, Puerto Rico this 20th day of June, 2022.

**Berkan/Mendez**
O'Neill St. G-11
San Juan, P.R. 00918-2301
Tel. (787) 764-0814;Fax (787) 250-0986
berkanmendez@gmail.com

By:

S/ Judith Berkan                          S/ Mary Jo Méndez Vilella
   Judith Berkan                             Mary Jo Méndez Vilella
   Temp phone 787 399-7657                Temp phone 787 309-3059
   USDC No.200803                         USDC No. 209407
   berkanj@microjuris.com                 mendezmaryjo@microjuris.com